IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG DIVISION

TERRENCE GILBERT, *et al.*,

          Plaintiffs,

v.                                   CIVIL ACTION NO.  6:08-cv-00953

MEDICAL MUTUAL OF OHIO COMPANY, *et al.*,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court are the parties' cross motions for summary judgment [Docket 37 and 39].  I **DENY** the cross motions and **REMAND** the claim to the plan administrator for further development.

**I.  BACKGROUND**

Plaintiffs Terrence and Mary Gilbert assert that their health insurer, defendant Consumers Life Insurance Company ("CLIC"), wrongfully refused to reimburse or indemnify them for medical expenses incurred to treat their newborn son, Nicholas Gilbert.  On June 30, 2007, Nicholas was born premature at St. Joseph's Hospital ("St. Joseph") in Parkersburg. (Compl. ¶¶ 15, 16; Jt. Stip. ¶ 5).  On July 2, 2007, Nicholas was transferred by air ambulance from St. Joseph's to Children's Hospital in Pittsburgh.  (Jt. Stip. ¶ 6).  Stat MedEvac, an air transport provider that is "A Service of

the Center for Emergency Medicine[1]" (AR0104), transported Nicholas at a cost of $16,452.00 (Compl. ¶ 20-21.) Nicholas ultimately recovered. (*Id.* ¶ 22.)

The parties stipulate that on or about July 5, 2007, CEM submitted a claim to CLIC on Nicholas' behalf to cover the air transport costs. (Jt. Stip. ¶ 7). CEM's claim form was accompanied by the written "TRANSPORT RECORD" ("transport record") that was created prior to Nicholas being taken to Pittsburgh. The transport record notes that the reason for air transport was "resp. distress." (AR0098). The document also includes the following handwritten notes by a St. Joseph respiratory therapist:

> Pt. is a 2 day old . . . who has an increasing oxygen requirement. He is currently in a 70% oxyhood with PO. readings of 98%. An arterial blood gas revealed a Pa0$_2$ in the 60's.
>
>     . . . .
>
> Parents are requesting transport to CHP for further care.

(*Id.*).

On July 27, 2007, during CLIC's initial consideration of the claim, the matter was apparently referred to an in-house medical reviewer using a CLIC transmittal form. The July 5, 2007, claim form and transport record were attached. The transmittal form posed a question to the reviewer and reproduced a quote from the transport record that it was Nicholas' parents who sought air transport on July 2, 2007. (AR0096 ("ALLOW OR DENY AIR AMBULANCE TRANSPORT AS MEDICALLY NECESSARY IN THIS CASE? DOCUMENTATION STATES PARENTS REQUESTED TRANSFER.")).

---

[1]The Center for Emergency Medicine ("CEM") is affiliated with Children's Hospital. (*See* Jt. Stip. ¶¶ 6-7).

On or about August 6, 2007, the reviewer checked a box on the CLIC transmittal form next to the word "DENIED" and added two sentences explaining the decision: (1) "[p]arents requesting transport," and (2) the request did not satisfy the applicable plan criteria. (AR0096). The reviewer's conclusion appears based upon the plan provision that air ambulance services are not deemed medically necessary when "utilized only for individual or family preference." (AR0058). Both the claim form and the transport record list a Dr. Armstrong, now known to be Dr. Orten C. Armstrong, as Nicholas' primary treatment provider and referring physician at St. Joseph. (AR0097-98).

On September 11, 2007, CEM appealed CLIC's denial of the claim. (AR0104). The appeal was a one-page letter from Dr. Thomas J. Doyle, the Associate Medical Director for Stat MedEvac. Dr. Doyle, who apparently never rendered any treatment to Nicholas, stated it was his medical opinion that Nicholas met the criteria for air transport:

> This was a 2-day old infant who was having an increasing oxygen requirement. The concern was of possible sepsis, and the patient received antibiotics at the referring facility. This patient required rapid transport with the pediatric critical care team to the tertiary care pediatric facility, as the patient was at high risk for respiratory failure and potential intubation. This circumstance would have been best served by neonatal pediatric critical care team.

(*Id.*). Dr. Doyle invited CLIC to contact him if it required any additional information regarding the care and transport of Nicholas. (*Id.*)

On September 28, 2007, CLIC sent the Gilberts two different explanations of benefits ("EOB"). The first EOB provided that the "PATIENT RESPONSIBILITY" for air transport was $16,452 but further indicated that processing of the claim had not been completed. (AR0106). The second EOB lists the $16,452 in charges but without any mention of patient responsibility beyond the following phrase:

> YOU MAY BE RESPONSIBLE FOR THIS CHARGE. THE SERVICE THAT WAS RENDERED IS NOT MEDICALLY ALLOWED FOR THE DIAGNOSIS LISTED ON THE CLAIM.  THE SERVICE WAS PROVIDED BY A PROVIDER WHO DOES NOT CONTRACT OR PARTICIPATE IN OUR PROGRAMS AND WHO MAY NOT AGREE TO ACCEPT OUR DECISION.

(AR0107).

On November 21, 2008, another document was generated by CLIC stating the following information concerning the appeal, again emphasizing the parental request found in the transport record:

> 11/01/07 . . . WILL SEND TO PA GAG FOR REVIEW OF AIR AMBULANCE TRANSPORT "PER PARENT'S REQUEST," /DXC.
> 11/19/07 . . .  PER P.A. DENY; HAS 02 SAT 98%, PARENTS REQUESTED TRANSPORT TO CHP/DXC.

(AR0114).  The same day, CLIC generated yet another document stating in pertinent part as follows:

> 11/26/07 . . . THERE ARE NO RECORDS UNDER FILENET; PLEASE REQUEST PATIENT CARE FLIGHT RECORDS/L1/DXC. (MORE)

(AR0116). On November 28, 2007, CLIC requested further information from CEM.  (Jt. Stip. ¶ 13; AR0124).   Despite having received Dr. Doyle's communication, CLIC sought flight records and "a letter of medical necessity substantiating the need for transfer."[2] (AR0124).  That same date a

---

[2] Seven pages of confidential medical records from CEM or its affiliate are found starting at page 128 of the administrative record.  According to the header on the first page of this document set, however, there appear to have been a total of 16 pages.  The parties do not explain the significance, or the even the absence, of the remaining nine pages.

The seven pages found in the administrative record reflect that, two days after his admission, Nicholas had a diagnosis of "Oxygen Desaturation" with the radiologist opining that Nicholas was exhibiting "RIGHT LOWER LOBE AIRSPACE DISEASE." (AR0128).  The follow-up physician is again noted on the records as "Dr. Armstrong[.]"  (AR0129, 0130).  The records reflect the following information as well: (1) the admission diagnosis included "[r]espiratory distress" and "[p]resumed sepsis" (*Id.*); (2) Nicholas continued to have tachypnea, or rapid, labored breathing, two days after he was admitted to the nursery at St. Joseph (AR 129-30); and (3) a July 3, 2007, radiology report prepared at Children's Hospital showed "congestion of the lungs" with
(continued...)

third EOB was sent to the Gilberts with $16,452 listed as the "PATIENT RESPONSIBILITY" and notices similar to those found on the second EOB. (AR0125).

On December 10, 2007, it appears that CLIC decided to deny the first appeal and uphold the refusal of benefits:

> UPHOLD DENIAL OF AIR AMBULANCE . . . ; THERE IS NOT SUPPORTING DOCUMENTATION THAT THE [AIR TRANSPORT] WAS EMERGENTLY INITIATED FOR A DETERIORATING MEDICAL CONDITION. "PARENTS ARE REQUESTING TRANSPORT TO CHILDREN'S HOSPITAL OF PITTSBURG [SIC] FOR FURTHER CARE."

(AR0117, 119). CLIC's decision appears to stem from independent physician reviewer Dr. Virginia Ribeiro's report authored the same date.[3] Dr. Ribeiro noted at the outset that the "[c]linical data submitted for review [w]as limited to the two-page transport record." (AR0135). The remainder of her "RATIONALE" provides pertinently as follows:

> There is no supporting documentation that the transfer was emergently initiated for a deteriorating medical condition. The patient was adequately oxygenated with supplemental oxygen and did not require airway or ventilatory support based on clinical data provided. There is no documentation that the patient required services

---

[2](...continued)
"PROBABLE TTN[,]" which is commonly defined as a more rapid and labored breathing (s*ee* AR 0132).

[3]While difficult to tell for certain, an October 25, 2007, review by another, perhaps in-house, reviewer also appears to have played a role in the appeal denial. The transmittal form sent by CLIC to that reviewer again includes the following question and comment as follows: "ALLOW OR DENY AIR AMBULANCE? PARENTS REQUEST TO HAVE CHILD TRANSPORTED. THANK YOU." The entirety of the reviewer's analysis consists of the checked box next to the word "Denied" and this phrase:

> 2 day old with increasg oxygen requirement[.] Parents requested transport to CHP[.]
> Does not meet MMO helicopt transpt criteria[.]

(AR0120). Attached to the reviewer's opinion is the same July 27, 2007, "TRANSPORT RECORD" mentioned earlier.

>unavailable at the referring facility. The Transport Record states "Parents are requesting transport to Children's Hospital of Pittsburgh (CHP) for further care". Corporate Medical Policy 200231 states: "Air ambulance services are considered not medically necessary in ... the following circumstances: Air ambulance is utilized only for individual or family preference." Based on the submitted clinical information, medical necessity criteria for air ambulance transport as established by the Corporate Medical Policy 200231 are not met.

(AR0135).[4]

On January 11, 2008, CLIC informed CEM of the denial of its first appeal. (AR0138). CLIC stated only that "Air ambulance transport was found to be not medically necessary as the patient's condition was not acute enough, or injuries were not severe enough to require immediate and rapid transport provided by air ambulance." (AR0138).

On an unspecified date thereafter, CEM initiated a second appeal. (Jt. Stip. ¶ 15). At some time following initiation of the second appeal, specifically on or about March 6, 2008, CLIC sent a "Provider Action Request" to a woman named Brenda at Dr. Armstrong's office. (AR0140). The apparent purpose of the document was to facilitate the receipt by CLIC of records from St. Joseph's concerning Nicholas' hospitalization, and transfer from, that facility. The Provider Action Request

---

[4]The "CLINICAL SUMMARY" that immediately follows Dr. Ribeiro's rationale appears to be gleaned from the transport record and provides materially as follows:

>The patient . . . was transported by air ambulance . . . for respiratory distress. He was noted to have increasing oxygen requirements and was on a 70% oxyhood with a 98% pulse oximetry and Pa02 in the 60s. The parents requested transport to CHP for further care. Vital signs included: temperature 98.8, heart rate 152, respiratory rate 52, and blood pressure 61/45. Glucose was 90. Physical exam showed an infant maintaining his own airway, comfortable, tachypneic at times but reported as in no distress. The right side of the clinical data is essentially unreadable secondary to a faded copy. The breath sounds were equal and clear. Skin was pale and warm. Apical heart rate was regular and peripheral pulses were palpable. . . .

(AR0136).

does not specify a deadline for receiving the St. Joseph's records.  On or about that same date, it appears that St. Joseph's compiled 18 pages of records and sent them via facsimile to Brenda. (AR0142-58).

On March 26, 2008, prior to receiving the records from St. Joseph's that were in Brenda's possession, Dr. Elena C. Antonelli, another physician reviewer apparently used by CLIC, offered the following "RATIONALE" for denying the transport claim:

> The history and documentation do not support the need for air ambulance transport to the receiving facility. The child was ill but sepsis was ruled out. There was no indication of a life or limb-threatening illness or condition that required air ambulance transportation on the date of the transport. There is no documentation that the referring hospital was unable to properly care for the patient. The parents reportedly requested that he be transported to the receiving facility, Children's Hospital of Pittsburgh.
>
> The Corporate Medical Policy for Medical Mutual of Ohio states "the Health Plan has determined that air ambulance transport of an individual from either the scene/field or medical facility is medically necessary when: . . . the traumatic injury or medical condition has created a significant risk of loss of life or loss of a limb of significant permanent disfigurement or significant, permanent disability." Examples include: . . . respiratory rate greater than or equal to 30/min or less than or equal to 9/min or SBP less than or equal to 90. . . . Other qualifying examples include . . . compromised . . . respiratory function, among others that do not apply to this case.

(AR159-60).  The "CLINICAL SUMMARY" supporting Dr. Antonelli's observations included the following:

> The patient . . . was transported to Children's Hospital of Pittsburgh on 07/02/2007 at 2010 ET with a chief complaint of respiratory distress. . . . He had been admitted to the nursery at the referring hospital but continued to have tachypnea and retractions for two days. The parents reportedly requested to have the child transported to Children's Hospital.
>
> According to the transport record, he had an "increasing oxygen requirement" and was in a 70% oxyhood with readings of 98%. An arterial blood gas revealed a Pa02 in the 60's. He had received ampicillin and gentamycin. He was received lying under a warmer hood. He appeared to be comfortable. He was tachypneic at times. Skin pale and warm to touch. Apical heart rate was regular and peripheral pulses palpable.

> Pink with capillary refill 2 sec. He was afebrile, pulse 152, RR 52, BP 61/45. Glucose 90. SP0299. During transport his respiratory rate increased to 62 (low of 42) and his heart rate averaged 140. His SP02 remained in the high 90s. Transport occurred without incident. Chest xray on 07/03/07 revealed Transitory Tachypnea of the Newborn (TTN). There was basilar congestion of the lungs which appeared well expanded. Chest xray on 07/05/2007 revealed right lower lobe airspace disease (increased pulmonary opacity). The patient was admitted to Children's Hospital of Pittsburgh and was discharged on 07/07/2007 with discharge diagnoses of respiratory distress and presumed sepsis which was ruled out.

(AR0160). On March 28, 2008, CLIC informed CEM that its second appeal had been denied. (AR0163). CLIC's letter-form justification for the denial was identical to that given by it previously to CEM on January 11, 2008. (*Id.*).

On April 30, 2008, Brenda executed the Provider Action Request sent to her by CLIC on March 6, 2008, and sent the 18 pages of St. Joseph's records to CLIC. (AR0140). CLIC stamped the materials received on May 5, 2009. (AR0140). The records seem noteworthy in several respects, including the following:

- Nicholas was diagnosed the day after his birth with "Probable TTN" (AR0142);

- A form document signed by Mary Gilbert, Nicholas' mother, entitled "CONSENT TO TRANSFER TO ANOTHER FACILITY" states "*The physician has informed me of the need for transfer*, potential benefits and risks associated with such transfer, alternatives to such transfer and the risks and benefits to such alternatives as well as the results likely to occur if transfer is not made." (AR0143 (emphasis added));

- That same form document has the following language immediately preceding Dr. Armstrong's signature: "The undersigned certifies that the risks and benefits of transfer, at the time of transfer, outweigh the risks not to transfer . . . ." (*Id.);*

- Dr. Armstrong's "Certification for Transfer" dated July 2, 2007, observed that Nicholas was at risk for "worsening respiratory distress[.]" Dr. Armstrong additionally noted that transfer to a tertiary care facility was necessary to obtain neonatology and pediatric cardiology care, along with advanced technology for airway management (AR0144);

- Dr. Armstrong's discharge diagnoses included "[p]ossible occult bactermia[,]" hypoxia, tachypnea, and possible pulmonary hypertension (AR0150); and

-8-

- Dr. Armstrong's discharge summary noted that Nicholas' oxygen requirement was increasing. (AR0150).

Dr. Armstrong offered these additional, contemporaneous explanations justifying emergency transport.

> I spoke with the neonatologist in Morgantown to discuss the possible etiologies of his hypoxia. We decided at that point in time that it was probably in the child's best interest to be at a tertiary care center since we were going to recommend 100% P102. The concern is that he may have pulmonary hypertension which will become refractory to conservative management. I spoke with a Dr. Bhatia at UPMC Children's in Pittsburgh per the father's request. After discussing the issue about this patient, she agreed that the child should be med-evacuated and we will be placed under the service of a Dr. Kohlan who is a neonatologist there. The child will be transferred via helicopter in stable condition but guarded condition.

(AR0151).

In its brief in opposition to the Gilberts' cross motion for summary judgment, CLIC's counsel explains how the St. Joseph's records were handled by CLIC during the administrative process:

> [T]o the extent Plaintiffs cite to Dr. Armstrong's medical records, this information was not submitted to CLIC by Plaintiffs for consideration of the Claim. That information was not submitted until months after the third appeal[5] and over 10 months after the Claim was submitted (and approximately 6 months after CLIC's request for further information). The Plan provides that, in conjunction with an appeal of a denial of benefits, claimants "may submit written comments, documents, records and other information relating to the claim being appealed." Dr. Armstrong's records and information were not submitted in conjunction with any of the three appeals and, therefore, cannot form the foundation for any retrospective assessment of CLIC's review. Indeed, as those records did not form the Administrative Record available to CLIC at the time of the appeal, those records and Plaintiffs' citations to them must be stricken.

(Def.'s Br. in Oppos. at 5-6 (citations omitted)).

---

[5] The administrative record reflects one claim denial and two appeals. The reference to a "third appeal" appears to be an oversight.

-9-

On June 25, 2008, the Gilberts instituted this action in the Circuit Court of Wood County. They named Medical Mutual of Ohio Company ("MMO"), individually and/or d/b/a CLIC, its wholly owned subsidiary, and Stat MedEvac. (Compl.) On July 28, 2008, one or more defendants removed. [Docket 1]. CLIC was later substituted for MMO as the real party in interest. [Docket 32]. On May 28, 2009, I granted Stat MedEvac's motion to dismiss for misjoinder. I concluded that the Gilberts had no viable claims against Stat MedEvac [Docket 35]. The pending cross motions for summary judgment are now ripe.

## II. Governing Standards For The Review of a Denial of Benefits Under ERISA And Remand for Further Proceedings by the Plan Administrator

The law governing judicial review of benefit decisions under ERISA changed somewhat with the decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S.Ct. 2343 (2008). *See Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 259-61 (2009); *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008). The decision in *Glenn*, however, left other ERISA review principles intact. For example, the review of a plan administrator's benefits decision continues to follow a *de novo* standard unless the plan provides otherwise. If the plan gives the administrator the power of discretionary review, an abuse-of-discretion standard applies. *See Glenn*, 128 S.Ct. at 2348; *Champion*, 550 F.3d at 358. In *Glenn*, the Supreme Court also reemphasized the link between trust law and the status of a plan administrator:

> The Court [in *Glenn*] thus reaffirmed its holding in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), that courts are to apply trust-law principles to ERISA determinations. Among the principles of trust law reiterated by *Firestone* are those that "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." 489 U.S. at 111, 109 S.Ct. 948 (citing G. Bogert & G. Bogert, Law of Trusts and Trustees § 559, at 169-171 (2d rev. ed.1980)).

-10-

*Carden*, 559 F.3d at 261.[6]

The new impact of *Glenn* is its discussion concerning how a reviewing court handles a conflicted administrator. Such a conflict is most frequently found when a plan administrator serves in the dual role of evaluating claims for benefits and paying those same claims. Following *Glenn*, an administrator's conflict of interest does not alter the standard of review, as was the case for many years in this circuit by way of the modified abuse of discretion standard. *See, e.g.*, *Champion*, 550 F.3d at 358 (noting the abandonment of the modified abuse of discretion standard and additionally observing that "*Glenn* altered several aspects of judicial review of ERISA plan determinations in the Fourth Circuit."). Instead, "a conflict of interest becomes just one of the 'several different, often case-specific, factors' to be weighed together in determining whether the administrator abused its discretion." *Carden*, 559 F.3d at 261 (quoting *Glenn*, 128 S. Ct. at 2351). The weight accorded to the conflict "will . . . depend largely on the plan's language and on consideration of other relevant factors." *Id.* A nonexclusive listing of the applicable factors is found in *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000):

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

---

[6]Contrary to CLIC's assertions, the *Firestone* approach does not equate with the arbitrary and capricious standard of review; instead, it is less deferential. *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 323 (4th Cir. 2008) ("[T]o be unreasonable is not so extreme as to be irrational.").

*Id.* at 342-43 (footnote omitted); *Carden*, 559 F.3d at 261. In the end, a reviewing court will not disturb a decision if it is "the result of a deliberate and principled reasoning process and is supported by substantial evidence." *Evans v. Metro. Life Ins. Co.*, 358 F.3d 307, 310–11 (4th Cir. 2004).

When a district court reviews a plan administrator's decision, as here, under the abuse of discretion standard, "an assessment of the reasonableness of the administrator's decision must be based on the facts known to . . . [the administrator] at the time." *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-609 (4th Cir. 1999) (quoting *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994)); *see also Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir.1995). In applying the *Booth* factors, then, it is critical that I know the facts that were known to and relied upon CLIC during its analysis of the claim:

> If the district court is to conduct meaningful appellate review of a benefit determination, even under a deferential standard, the administrative record must document the decision-making process. If the evidence before the plan administrator is inadequate, the district court should remand the case to the administrator to receive additional evidence and to make a new determination.

*Bernstein*, 70 F.3d at 789.

Although remand is not a common outcome in the claim-denial review setting, it sometimes plays a critical role:

> If the court believes the administrator lacked adequate evidence on which to base a decision, "the proper course[is] to 'remand to the trustees for a new determination,' not to bring additional evidence before the district court." As we have previously indicated, however, "remand should be used sparingly." Remand is most appropriate "*where the plan itself commits the trustees to consider relevant information which they failed to consider or where [the] decision involves 'records that were readily available and records that trustees had agreed that they would verify.*'" The district court may also exercise its discretion to remand a claim "where there are multiple issues and little evidentiary record to review."

*Elliott*, 190 F.3d at 609 (emphasis supplied) (citations and quoted authority omitted); *Sheppard*, 32 F.3d at 125; *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir.1993); *Berry*

*v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985) ("Case for remand of benefit termination decision to pension plan trustees is strongest where plan itself commits trustees to consider relevant information which they failed to consider or where decision involved records that were readily available and records that trustees had agreed that they would verify.").[7]

When one takes account of the importance of the ERISA administrative scheme in the area of employee benefits, the rationale behind the rule of remand is apparent:

> [T]he administration of benefit and pension plans should be the function of the designated fiduciaries, not the federal courts. We also emphasize[] the importance of promoting internal resolution of claims and encouraging informal and non-adversarial proceedings under ERISA.

*Bernstein*, 70 F.3d at 788-89. The circumstances that warranted a remand in *Bernstein* are noteworthy for present purposes:

> We conclude that the administrative record before CapitalCare at the time it denied benefits for Jeffrey Bernstein's hospitalization was inadequate to allow the district court to conduct a meaningful review of the decision. During discovery in this lawsuit before the district court, much relevant additional evidence has been developed, and the remaining issues have been narrowed. However, the benefit determination should first be made by the plan administrator. Accordingly, we must vacate the district court's ruling and remand with instructions to remand the case to the CapitalCare plan administrator to review the evidence that has been developed since the original denial, to receive additional evidence, and to make a new determination.

---

[7]In *Berry*, the court of appeals observed as follows:

> As administrator of a plan governed by ERISA, the trustee must comply with the procedural requirements of 29 U.S.C. § 1133 and the regulations promulgated thereunder, specifically 29 C.F.R. § 2560.503-1. ERISA was designed to promote "internal resolution of claims," to permit "broad managerial discretion" on the part of pension plan trustees in formulating claims procedures, and to encourage informal and non-adversarial proceedings . . . . It also establishes basic procedures to protect plan participants from arbitrary decisions, among them a statement of reasons to the claimant for a denial of benefits and an appropriate internal procedure for review of adverse actions.

*Id.* at 1007.

*Bernstein*, 70 F.3d at 790.

### III. Analysis

It is undisputed that the plan vests CLIC with discretion to determine benefit eligibility. Thus, the deferential standard of review applies and all of the *Booth* factors, along with the administrator's conflict of interest, are considered. One *Booth* factor that is central to the parties' dispute is the adequacy of the materials considered by CLIC in denying benefits for the transport and the degree to which the materials it considered supported the decision. The Gilberts contend that CLIC's decision was inconsistent with the medical opinion of Dr. Armstrong, Nicholas' treating physician. (S*ee* Mem. Supp. Pls.' Cross-Mot. Summ. J. 4–6). The Gilberts also fault CLIC for failing to obtain Dr. Armstrong's medical opinion or consider it during the review process (*see id.* at 7–8; Pls.' Resp. Def's Cross-Mot. & Br. Opp'n 2, 3.) CLIC notes that the plan does not obligate it to pay for a particular treatment simply because a provider recommends or prescribes it. (Def.'s Br. Opp'n Pls.' Mot. Summ. J. 5 (citing AR0041 (Plan, pg. 37)).) Its foremost contention though is that it was not obligated to consider Dr. Armstrong's opinion because "it was not submitted until months after the third appeal and over 10 months after the Claim was submitted (and approximately 6 months after CLIC's request for further information)." (Def.'s Br. Opp'n Pls.' Mot. Summ. J.5–6 (citing *Stup v. UNUM Life Ins. Co. of Amer.*, 390 F.3d 301, 307 (4th Cir. 2004) (noting that courts review administrators' decisions to deny benefits "'based on the facts known [to the administrator] at the time'" (citation omitted)).)

-14-

The Gilberts reply that they "had no idea regarding what records were part of the Administrative Record in this case until they filed th[is] lawsuit" and that it was CLIC's obligation to obtain and review Dr. Armstrong's opinions at the earliest opportunity. (Pls.'Resp. Def.'s Cross-Mot. & Br. Opp'n 3-4.) There is merit to the Gilberts' contention given the unusual posture of this action during the administrative review process. As stipulated by the parties, it was not the Gilberts who submitted to CLIC the claim or the two appeals for air transport. It was CEM. Additionally, when CLIC sought further information concerning the claim, it directed the request not to the Gilberts but, again, to CEM and, much later, the individual named Brenda at Dr. Armstrong's office. Before those records were received by CLIC, it denied the second appeal. It appears from the administrative record that the only communications received by the Gilberts were the three somewhat confusing EOBs.

Our court of appeals has recognized that dicta in some of its cases may require an administrator, under certain circumstances, to develop additional evidence concerning a claim for benefits. *See Lucy v. Macsteel Service Center Short Term Disability*, No. 03-1281, 2004 WL 1784453, at * 3 (4th Cir. 2004) (citing *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir.1985), as "indicating in *dicta* that disability plans may have a duty to develop evidence in certain circumstances" and; *LeFebre v. Westinghouse Elec. Corp. Mgmt. Disability Benefits Plan*, 747 F.2d 197, 206 (4th Cir.1984) , as indicating the "same").

That issue aside, however, CLIC has in its records the St. Joseph's file that was never considered by it during the administrative proceedings. The file includes the contemporaneous diagnoses and treatment plans of Dr. Armstrong, Nicholas' treating physician. It is true, as CLIC suggests, that ERISA does not require plan administrators to defer to treating physicians. *Black &*

*Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). At the same time, an administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." *Id.* at 823.

The difficulty here, of course, is that CLIC never considered Dr. Armstrong's opinions at all, despite having received them before the institution of this action. Dr. Armstrong's contemporaneous appraisal of Nicholas' condition, and the necessity for expedited transport, are reflected in detail in the St. Joseph's records. This omission is especially troubling given that the Gilberts, the primary beneficiaries on the claim, apparently had no idea how the claim was being pursued on their behalf.

A full and fair review thus warrants that the St. Joseph's records be considered. I deem that matter best handled in the first instance by CLIC, within its established plan parameters for administrative review. *See Brogan v. Holland*, 105 F.3d 158, 164 (4th Cir 1997)("Our narrow standard of review 'exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional.'") (quoting *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1006 (4th Cir. 1985)). The only way to achieve that is a remand of the claim for further analysis by CLIC, with particular emphasis on the St. Joseph's records and any additional claim information that CLIC or the Gilberts wish to develop or offer.

Newborn infants number themselves among the most fragile of patients encountered and treated by the medical community. This is especially true of a child, only a few days old, whose very ability to breathe was apparently compromised in a serious way. The administrator thus must have at its disposal all records relating to the most sensitive decision concerning Nicholas' emergency transport at a time when his condition might have rapidly deteriorated and second

chances might not have been available. In order to qualify as "reasoned and principled" under the fifth *Booth* factor, it is imperative that adequate consideration be given by the plan administrator to the decisions made and opinions offered by a treating physician during an emergency. This is especially important where as here, documentation of such facts is in the plan administrator's possession. Accordingly, in the interest of procedural and substantive fairness, and to permit me to conduct an adequate review using the *Booth* factors should the Gilberts institute a future civil action, I **ORDER** that the claim be remanded to CLIC to allow it to consider and analyze the St. Joseph's records and any additional claim information that CLIC or the Gilberts wish to develop or offer. In view of the remand, I decline at this time to address the Gilberts' asserted claim for breach of fiduciary duty, which appears subsumed by their denial of benefits claim in any event.

### IV. CONCLUSION

Based upon the foregoing discussion, the parties' cross motions for summary judgment are **DENIED**. This action is **DISMISSED** and **STRICKEN** from the docket and the underlying claim is **REMANDED** to CLIC for further action not inconsistent with this memorandum opinion and order.

The court **DIRECTS** the Clerk to send a copy of this written opinion and order to counsel of record and any unrepresented party.

ENTER: October 30, 2009

Joseph R. Goodwin, Chief Judge